AJULIA M. JAYNE (State Bar No. 202753)
E-Mail: *julia@jaynelawgroup.com*
JAYNE LAW GROUP, P.C.
483 9th Street, Suite 200
Oakland, California 94607
Telephone: (415) 623-3600
Facsimile: (415) 623-3605

Attorney for Defendant
CARLOS LUNA RODRIGUEZ

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 18-00240 CRB |
| Plaintiff, | **CARLOS LUNA RODRIGUEZ'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE UNDER 18 U.S.C. § 3553(a)** |
| v. | |
| CARLOS LUNA RODRIGUEZ, | |
| Defendant. | Date: March 15, 2019<br>Time: 11:00 a.m.<br>Judge: Hon. Charles Breyer |

LAW OFFICES
JAYNE LAW GROUP, P.C.
483 9TH STREET, SUITE 200
OAKLAND, CALIFORNIA 94607

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
JAYNE LAW GROUP, P.C.
483 9TH STREET, SUITE 200
OAKLAND, CALIFORNIA 94607

## <u>TABLE OF CONTENTS</u>

PROCEDURAL BACKGROUND ...................................................................................2

I.   FACTUAL BACKGROUND AND HISTORY ..................................................3

     A.   Personal History.....................................................................................3

          1.   Family ..........................................................................................3

          2.   Employment History....................................................................4

          3.   Personal Relationships and Character.........................................5

     B.   The Offense Conduct ............................................................................5

II.  OBJECTIONS TO PRESENTENCE REPORT ...............................................7

     A.   Base Offense Level: U.S.S.G. § 2D1.1(a)(5) ......................................7

     B.   The Court Should Apply U.S.S.G.§ 3B1.2 for a 4-Point Role Reduction ..........8

          1.   Understanding of the Scope and Structure of Criminal Activity..................8

          2.   Defendant's Participation in Planning and Organizing .............................9

          3.   Defendant's Decision-Making Authority ...................................9

          4.   Defendant's Responsibility and Discretion ...............................9

          5.   Degree to Which Defendant Stood to Benefit ............................9

     C.   The Court Should Apply a 2-Level Minimal Participation Reduction on the Basis of U.S.S.G.§ 2D1.1(b)(16) ............9

     D.   Total Offense Level is 21 ....................................................................10

III. THE APPLICABLE GUIDELINE RANGE IS THE "STARTING POINT" AND "INITIAL BENCHMARK" FOR THIS COURT ...................................10

     A.   *Gall* and *Kimbrough* Clarified the Vast Discretion of this Court to Impose a Below-Guidelines Sentence ........................................................10

     B.   The Ninth Circuit Has Declined to Apply a Presumption of Reasonableness to a Guidelines Sentence ........................................................11

IV.  FACTORS RELEVANT TO A SENTENCE THAT IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY ...............................................................13

     A.   The Nature and Circumstances of the Offense and Mr. Rodriguez's History and Characteristics Show that this was Aberrant Conduct..............13

     B.   Need for Just Punishment in Light of Seriousness of the Offense....................14

i

**D.** **Incarceration Does Not Further Specific Deterrence - Need to Protect the Public** .................................................................................**15**

**E.** **Policy Statements in Favor of Departures** .............................................**16**

**CONCLUSION** ........................................................................................................**17**

LAW OFFICES
JAYNE LAW GROUP, P.C.
483 9ᵗʰ Street, Suite 200
OAKLAND, CALIFORNIA 94607

## **TABLE OF AUTHORITIES**

<u>Cases</u>

*Gall v. United States,* 128 S. Ct. 586 (2007)...........................................................................10, 11

*Johnson v. California*, 543 U.S. 499 (2005) ..................................................................................15

*Kimbrough v. United States*, 128 S.Ct. 558 (2007) ................................................................10, 11

*Koon v. United States*, 518 U.S. 81 (1996) ...................................................................................11

*Rita v. United States*, 551 U.S. 338 (2007) ...................................................................................12

*United States v. Autrey*, 555 F.3d 864 (9th Cir. 2009) ...................................................................12

*United States v. Booker*, 543 U.S. 220 (2005) ..............................................................................10

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) ..............................................................11, 13

*United States v. Davis*, 2008 WL 2329290 (S.D.N.Y. June 5, 2008) .............................................13

*United States v. Dorvil*, 784 F. Supp. 849 (S.D. Fla. 1991) ...........................................................8

*United States v. Hadash*, 408 F.3d 1080 (8th Cir. 2005) ...............................................................13

*United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) ....................................................................12

*United States v. Lazenby* 439 F.3d 928 (8th Cir. 2006) .................................................................12

*United States v. Paul*, 239 F. Appx 353 (9th Cir. 2007) ................................................................12

*United States v. Wachowiak*, 496 F.3d 744 (7th Cir. 2007) ...........................................................12

*United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) ...........................................................11

*United States v. Woods*, 159 F.3d 1132 (8th Cir. 1998) ................................................................12

<u>Statutes</u>

18 U.S.C. § 3553 ...........................................................................................................................15

18 U.S.C. § 3553(a) .......................................................................................................................16

<u>Federal Sentencing Guidelines</u>

U.S.S.G. § 2D1.1(a)(5) ...............................................................................................................8, 10

U.S.S.G. § 3B1.2..............................................................................................................................8

U.S.S.G. § 5H1.6 ...........................................................................................................................21

U.S.S.G. § 5K2.0 ...........................................................................................................................21

LAW OFFICES
JAYNE LAW GROUP, P.C.
483 9TH STREET, SUITE 200
OAKLAND, CALIFORNIA 94607

LAW OFFICES
JAYNE LAW GROUP, P.C.
483 9TH STREET, SUITE 200
OAKLAND, CALIFORNIA 94607

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Other Authorities

Craig Haney, *The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment* 4....................................................................................................................................20

Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) ...............................................................................18

Martin H. Pritikin, *Is Prison Increasing Crime*, 2008 Wis L. Rev. 1049, 1054-72 .................19, 20

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ...............18

Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005).....16, 17

U.S. Dep't of Justice*, Federal Prison System FY 2018 Performance Budget* ...............................19

U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* ........................................................................................................18

U.S.S.C. Interactive Sourcebook of Federal Sentencing Statistics....................................................21

U.S.S.C., Staff Discussion Paper, *Sentencing Options under the Guidelines* 19 (1996)................19

LAW OFFICES

JAYNE LAW GROUP, P.C.

483 9TH STREET, SUITE 200
OAKLAND, CALIFORNIA 94607

## SENTENCING MEMORANDUM

The Defendant Carlos Luna Rodriguez, through his counsel, Julia M. Jayne, hereby submits the following Sentencing Memorandum in support of his request for a sentence of one year and one day of custody time.

## INTRODUCTION

Born in Mexicali, Baja California, Carlos Luna Rodriguez is a twenty-three-year-old father of three. He has spent the last several years working as a professional truck driver. In April 2018, Carlos reluctantly and unwittingly agreed to help his mother's husband, Bernardo Leyva Olivas, on a long-haul commercial truck drive because Mr. Olivas' license was suspended and his job depended on the delivery of food being completed. Carlos was reluctant because he had his own truck-driving job and responsibilities and the journey would take him away from his family for several days. After numerous requests from his mother to help her husband complete the journey, Carlos relented and agreed to help out his family. Specifically, his stepfather, Mr. Olivas asked Carlos to drive a commercial truck to deliver fruit, vegetables and sandwiches on a route stretching from California to Washington. After getting permission from KTR Logistics Mexicali Trucking Company, his employer, Carlos embarked on the trip.

It was *during* the trip that Carlos learned that about the contraband. This discovery put Carlos in a precarious position: he could exit the truck and try to get home without money, transportation, or the ability to speak English, or he could finish the delivery and get back home to his heavily pregnant wife. He decided to finish the delivery.

However, Carlos did not return home to his pregnant wife. Instead, the truck was stopped and searched, the drugs discovered by law enforcement, and Carlos has sat in jail since April 26, 2018. His son, Tadeo, was born while he was in custody.

Carlos Luna Rodriguez does not seek to avoid responsibility for his actions. Rather, this memorandum is submitted to provide context for the Court's consideration of an appropriate sentence. In selecting that sentence, Mr. Rodriguez respectfully asks this Court to take into

account his extremely limited role, his lack of advance knowledge, and his nonexistent criminal history.

## PROCEDURAL BACKGROUND

On April 26, 2018, Mr. Olivas and Mr. Rodriguez were arrested in the state of Washington, and Mr. Rodriguez was later transferred to the Northern District of California. When Mr. Rodriguez appears before the court on March 15, 2019, he will have been in jail for 323 days.

On June 5, 2018, a single-count indictment was filed, charging Mr. Rodriguez and Mr. Olivas, with violations of 21 U.S.C. § 846, and 21 U.S.C. §§ 841(a)(1), (b)(1)(A), conspiracy to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing methamphetamine. On November 16, 2018, a single-count superseding information was filed, alleging violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii), possession with intent to distribute methamphetamine. On December 19, 2018, Mr. Rodriguez pled guilty to a single count of possession with intent to distribute. This amended charge was more appropriate given that Mr. Rodriguez was not aware of or involved in a criminal conspiracy.

On March 15, 2019, Mr. Rodriguez will stand before this court for sentencing. When he does, it will be as a young man in a foreign country. According to the United States Sentencing Commission (U.S.S.C.) guidelines, Mr. Rodriguez's base offense level is 32[1]. Applying the various guideline adjustments to Mr. Rodriguez's base offense level, **his adjusted offense level is 21, which carries a guidelines sentence of 37-46 months**. This base offense level does not reflect any section 3553(a) factors.

The U.S. Probation Officer recommends a sentence of 46 months. This recommendation reflects Mr. Rodriguez's lack of criminal record, but does not adequately reflect consideration of

---

[1] This level is in dispute, as discussed below. His plea agreement included a base offense level range of Level 32-38.

LAW OFFICES
JAYNE LAW GROUP, P.C.
483 9TH STREET, SUITE 200
OAKLAND, CALIFORNIA 94607

the collateral consequences resulting from his arrest, incarceration, conviction and his extremely limited involvement in the offense. As discussed below, Mr. Rodriguez is respectfully submitting to the Court a sentence of one year, or credit for time served. He will have been incarcerated for 323 days by the time of sentencing. This sentence would fulfill 18 § U.S.C. 3553(a)'s objectives because it is sufficient but not greater than necessary to achieve the Guidelines' sentencing goals.

**DISCUSSION**

**I.     FACTUAL BACKGROUND AND HISTORY**

    **A.  Personal History**

        1.  <u>Family</u>

Carlos Luna Rodriguez was born in Baja California, Mexicali, to Carlos Luna Sandoval and Clara Rodriguez-Salazar, where he has lived his entire life and intends to live in the future. Carlos says that he grew up in a stable home, but also acknowledges financial difficulties and his mother's regular alcohol use, especially in the years leading up to his parents' divorce at age 10. PSR ¶ 40. When his parents divorced, Carlos's responsibilities increased; he watched his sister, Evelyn, while his mother worked, and in high school, he began working in his mother's store. PSR ¶ 42. After the divorce, Carlos saw his father once a week and he continues to have an active and positive relationship with his father, who also resides in Mexicali. PSR ¶ 40.

When he was seventeen, Carlos's girlfriend, Margarita Franco Chavez, became pregnant with their first child, Carlos Luna Franco. PSR ¶ 45. Carlos and Margarita moved in together, and Carlos began working full-time. While Carlos and Margarita are no longer in a romantic relationship, their relationship is friendly and supportive. Their 5-year-old son lives with Margarita in Mexicali, and Carlos provides regular support, eager to avoid the financial troubles that plagued his early life. PSR ¶ 45.

Three years ago, Carlos started dating Lucero, a 21-year-old factory worker. Eventually, Lucero became pregnant with Miriam, their now 2-year-old daughter. PSR ¶ 44. In 2017, Lucero and Carlos realized they were pregnant and this time, they were expecting a boy. Because of his arrest and subsequent incarceration, Carlos missed the birth of their child, has never met his son,

LAW OFFICES
JAYNE LAW GROUP, P.C.
483 9TH STREET, SUITE 200
OAKLAND, CALIFORNIA 94607

and, most painfully, has not seen his wife or any of his children (who are all in Mexico) for the past year.

Despite his youth, Carlos is a committed family man, priding himself on his dedication to Lucero and their children. In many ways, this is a result of his upbringing: he understood the importance of earning a legitimate living, working hard, supporting his family, and taking care of his responsibilities. While he may have struggled financially at times in his youth, he always had enough to eat and a roof over his head. He has sought to provide the same for his own family.

While jail is difficult for anyone, Carlos's struggles are particularly pronounced. Because he has never been so much as arrested, he is not familiar with the rigors of incarceration. His difficulties are further amplified by his inability to speak English: he cannot speak to most of his cellmates, understand the guards, or participate in programming. Of course, he also knows that Lucero struggles with the financial consequences of his incarceration. Despite recently giving birth, she continues to work in a factory, desperately trying to earn enough to support both herself and their two children. Because of the financial difficulties, she had to give up their family home and move in with her mother in Mexicali. Every day, his family struggles in his absence.

Given Carlos's unfortunate decision not to exit the truck when he learned about the drugs and his otherwise law-abiding life, a sentence that would allow him to return home to his family as soon as possible is the most just and appropriate. He has expressed his remorse, his struggles, and his hope for the future in a letter to this Court, attached as Exhibit B. *See* Declaration of Julia M. Jayne ("Jayne Decl."), Exh. B (with translation).

### 2. Employment History

Carlos began working full-time at age 17. As a result, he has a ninth-grade education. PSR ¶ 50. Knowing that his education significantly limited his economic opportunities, Carlos decided to get his commercial trucking license. After completing a rigorous yearlong program, Carlos was hired as a truck driver in 2016. To date, he has been employed by three different reputable Mexican trucking companies. PSR ¶ 51. During the time of this offense, Carlos worked as a driver for KTR Logistics Mexicali Trucking Company (KTR). Before KTR, he drove for In Transit

LAW OFFICES
JAYNE LAW GROUP, P.C.
483 9ᵗʰ STREET, SUITE 200
OAKLAND, CALIFORNIA 94607

DEFENDANT'S SENTENCING MEMO

Express and B&B Transport. As a driver, Carlos made numerous *legal* trips to and from the United States, but his home was and continues to be in Mexico.

At the time of this offense, Carlos was on assignment for Martinez Trucking, the company who employed Mr. Olivas. Before agreeing to assist his stepfather on the delivery, Carlos made sure to get KTR's permission. Carlos explained that he would accompany his stepfather because his stepfather's driver's license was suspended, which meant that Mr. Olivas risked losing his job. To ensure that his stepfather would keep his job, Carlos agreed to drive the shipment of fruit, vegetables and sandwiches from California to Washington. At the time, Carlos thought the delivery was completely legitimate because the co-defendant said he'd be paid $1,500 by Martinez Trucking, which is industry standard. Carlos was also under the belief that his commercial license and permit to lawfully enter the U.S. allowed him to drive whatever distance the employer authorized. Carlos also discussed the legitimate delivery with the owner of Martinez Trucking. It was only during the trip that he learned he'd been deceived. Carlos was never paid for driving.

### 3.   Personal Relationships and Character

Carlos is a devoted family man, known in his neighborhood for his love of soccer and boxing. PSR ¶ 41. Even as a teenager, Carlos was committed to others. Before leaving school to work full-time, Carlos volunteered for the Red Cross. PSR ¶ 42. The letters from his family further describe with sincerity a young man who has tremendous family support, who was raised with good morals and respect for the law, who has never been in trouble in Mexico, and who is intelligent, hard-working and who will only become wiser through this ordeal. *See* Jayne Decl. Exhibit A (letters).

### B.  The Offense Conduct

In explaining what occurred, Carlos is not denying responsibility. At the same time, he wants the Court to understand that the offense occurred because of an exceedingly difficult situation, one with two seemingly disastrous outcomes. His Hobson's choice landed him in custody facing sentencing for a federal drug offense.

LAW OFFICES
JAYNE LAW GROUP, P.C.
483 9TH STREET, SUITE 200
OAKLAND, CALIFORNIA 94607

There should be no dispute before this Court of Carlos's lack of advance knowledge of the drugs – upon embarking on the journey, he had no idea it would entail a drug delivery. Had he known in advance, he would have *never* risked his life and livelihood and would never have gotten behind the wheel of that truck. There can be no doubt that Carlos is not involved in the drug trade, does not know where the drugs came from, does not know who was involved in the conspiracy, and did not even know the quality and quantity of the drugs. PSR ¶ 14. He had never seen fentanyl or methamphetamine before. Carlos's only knowledge came from his unexpected discovery of packaged narcotics when he climbed into the berth of the truck to take a nap.

In that moment, he realized he had two options: he could refuse to go any further by jumping out of the truck, which meant trying to get back to Mexico without transportation, sufficient funds, or the ability to speak English . . .  or he could continue driving. He rationalized that if he completed the delivery, he would be able to drive back to Mexico. When he weighed his options, he decided to complete the drive. He understood that being in possession of all those drugs was illegal (and thus agreed to plead guilty to such) but he also knew that he would very likely get hurt or killed if he tried to return to Mexico on foot.[2]

Once again, Carlos believed that the delivery was for a variety of perishable food items, and he would be paid $1,500 for driving the truck. Because $1,500 is industry standard for this type of delivery, Carlos didn't suspect anything amiss. After all, he wasn't to be paid more than normal, and he didn't think his stepfather would purposefully put him and his family at risk.

Yet Carlos freely admits that he should have chosen to walk back to Mexico if that's what it took. He appreciates that his actions were wrong and he has been punished for the past year for

_____

[2] Carlos was so astounded to find the drugs that he foolishly took photos of the drugs and text them to his wife. She replied in equal surprise, hoping he would be ok. Anyone with any sophistication in the drug trade would know never to do such a thing. The photos only demonstrate his naivety, his lack of knowledge and his own astonishment at his "discovery" in the truck.

Case No. CR 18-00240 CRB
DEFENDANT'S SENTENCING MEMO

LAW OFFICES
JAYNE LAW GROUP, P.C.
483 9ᵀᴴ STREET, SUITE 200
OAKLAND, CALIFORNIA 94607

his conduct. In addition to being incarcerated for the past year, he missed the birth of his son and has not been able to hold his children or support his family. What he and his family have suffered should serve as sufficient retribution, deterrence and rehabilitation for his offense.

## II.     OBJECTIONS TO PRESENTENCE REPORT

Paragraphs 4, 19-28: Guidelines Calculation

Pursuant to both the United States Sentencing Guidelines (USSG) § 2D1.1 and his plea agreement, the base offense level for Mr. Rodriguez should be 32, contrary to the Probation Officer's calculation of a base offense level of 38. Mr. Rodriguez is also eligible for several reductions, as further detailed below.

### A.     Base Offense Level: U.S.S.G. § 2D1.1(a)(5)

Mr. Rodriguez' plea agreement sets forth a range for the applicable base offense level. The range is from Level 32 to 38. A range, rather than a given number, was specifically included due to the legitimate arguments supporting a level within that range. For following reasons, Mr. Rodriguez submits to this Court that the most relevant and applicable starting point is a base offense level of 32:

- Pursuant to § 2D1.1(a)(5) and Paragraph 7(a) of his plea agreement: "If the resulting offense level is greater than level 32 and the defendant receives the 4-level ('minimal participant') reduction in §3B1.2(a), decrease to level **32**."

- Mr. Rodriguez fits the minimal participant definition to the word. He qualifies to receive the 4-level minimal participant reduction. As a result, the base offense level must be 32.

If this Court finds that Mr. Rodriguez is entitled to the 4-point minimal role reduction, then his base offense level *automatically drops to Level 32. See* U.S.S.G. § 2D1.1(a)(5). That is not in dispute. What is disputed between the parties is what degree of role reduction Mr. Rodriguez should receive. For the reasons described below, Mr. Rodriguez's extremely limited involvement demands a finding of "minimal participant."

LAW OFFICES
JAYNE LAW GROUP, P.C.
483 9TH STREET, SUITE 200
OAKLAND, CALIFORNIA 94607

**B.  The Court Should Apply U.S.S.G.§ 3B1.2 for a 4-Point Role Reduction**

Pursuant to § 3B1.2, Mr. Rodriguez is a minimal participant warranting a 4-point role reduction. A "minimal participant" is someone who plays a "minimal role in the criminal activity." *Id.* This provision covers defendants who are plainly among the *least culpable* of those involved in a group's conduct. U.S.S.G. § 3B1.2, n. 4, 6. Further, "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." *Id. See United States v. Dorvil*, 784 F. Supp. 849, 851-52 (S.D. Fla. 1991) (Court finding that defendants were minimal participants because they had no understanding of the "scope of structure of the enterprise," were merely offloading the drug delivery, did not learn about the cocaine until they arrived in Miami, they had no proprietary interest in the cocaine, and, unlike others, their cooperation was not critical to its success).

Mr. Rodriguez, like the defendants in *Dorvil*, fits squarely into the "minimal participant" definition. As described in his plea agreement, Mr. Rodriguez did not know about his stepfather's plans, did not know that he was being asked to drive a truck full of drugs, and he did not learn that drugs had been loaded onto the truck until he was already on the journey to Washington. He does not know anything about where the drugs came from or who was in charge. That he took photos after making his discovery does not elevate his role in any way: it only corroborates his surprise and naivety.

The use notes further explain that in the fact-based determination of whether someone is a "minimal participant," the court is to consider the defendant's understanding of the scope and structure of the criminal activity, his participation in planning and organizing, his decision-making authority, his responsibility and discretion, and the degree to which he stood to benefit. *Id.* at n. 3.

1.    Understanding of the Scope and Structure of Criminal Activity

When Mr. Rodriguez agreed to drive the truck, he believed that he was agreeing to a legitimate job. To this day, he does not know anything about the "scope or structure" of who was the owner of the drugs, who organized the transport, or who stood to benefit. All he is aware of is that his stepfather was the one who asked him to drive because of his own suspended license.

LAW OFFICES
JAYNE LAW GROUP, P.C.
483 9TH STREET, SUITE 200
OAKLAND, CALIFORNIA 94607

LAW OFFICES

JAYNE LAW GROUP, P.C.

483 9ᵀᴴ Sᴛʀᴇᴇᴛ, Sᴜɪᴛᴇ 200

OAKLAND, CALIFORNIA 94607

2.   <u>Defendant's Participation in Planning and Organizing</u>

Another factor for the Court to consider, according to the use notes, is the degree of the defendant's participation in planning and organizing. This answer is easy: none. Mr. Rodriguez planned and organized nothing.

3.   <u>Defendant's Decision-Making Authority</u>

Yet again, Mr. Rodriguez held no decision-making authority. Had he been advised of the real purpose of the journey, he would have immediately declined.

4.   <u>Defendant's Responsibility and Discretion</u>

The only discretion undertaken by Mr. Rodriguez was whether to jump out of the truck or continue with the drive upon his discovery of the drugs. He exercised that self-discretion. However, with respect to the conspiracy alleged against his co-defendant, he exercised zero responsibility and discretion, which is what the role analysis refers to.

5.   <u>Degree to Which Defendant Stood to Benefit</u>

Mr. Rodriguez stood to benefit nothing. He was to be paid (upon completion of the food delivery) only for the legitimate employment of driving a truck full of perishable items. Once again, this factor points to the clear conclusion that Mr. Rodriguez was a minimal participant.

Ultimately, Mr. Rodriguez's culpability is confined to *continuing* to drive the truck after discovering illegal narcotics. While this was a poor decision, it is also an understandably human one and one that merits the 4-point minimal participant role reduction.

**C.   The Court Should Apply a 2-Level Minimal Participation Reduction on the Basis of U.S.S.G.§ 2D1.1(b)(16)**

Pursuant to § 2D1.1(a)(5) and Mr. Rodriguez's plea agreement,

If the defendant receives a 4-level ('minimal participant') reduction in § 3B1.2(a) and the offense involved all of the following factors:

(A) The defendant was motivated by a… familial relationship … and was otherwise unlikely to commit such an offense;

(B) The defendant received no monetary compensation from the illegal … transport or storage of the controlled substances; and

(C) The defendant had minimal knowledge of the scope and structure of the enterprise,

**Decrease by 2 levels**. *Id*.

Mr. Rodriguez satisfies the requirements outlined above. He agreed to drive the truck because his stepfather and mother pressured him to help out when Mr. Olivas' license was suspended. This pressure from his family caused him to agree to a lawful journey and then caused him to continue driving and not abandon his stepfather when he learned about the drugs. Further, he was not going to be paid for any illegal activity and he did not know the scope and structure of the enterprise whatsoever. Because Mr. Rodriguez is a minimal participant who clearly satisfies the factors outlined above, a reduction of 2 points based on § 2D1.1(b)(16) is appropriate.

**D. Total Offense Level is 21**

Taking into account all of the clearly-applicable reductions noted above and in his plea agreement, the proper calculation should be as follows:

| | |
|---|---|
| Base Offense Level | 32 |
| Role Reduction (minimal participant) | -4 |
| Minimal Participation Reduction | -2 |
| Safety Valve | -2 |
| Acceptance of Responsibility | -3 |
| Adjusted Offense Level | **21** |

**III.   THE APPLICABLE GUIDELINE RANGE IS THE "STARTING POINT" AND "INITIAL BENCHMARK" FOR THIS COURT**

**A.  *Gall* and *Kimbrough* Clarified the Vast Discretion of this Court to Impose a Below-Guidelines Sentence**

In *Gall v. United States,* 128 S. Ct. 586, 598 (2007) and *Kimbrough v. United States*, 128 S.Ct. 558 (2007), the Supreme Court set forth the proper analysis that district courts should follow in evaluating a sentence in the wake of *United States v. Booker*, 543 U.S. 220 (2005):

A district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration… after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553 (a) factors to determine whether they support the sentence requested by a

party. In doing so, he may not presume that the Guideline range is reasonable. He must make an individualized assessment based on all the facts presented.

*Gall,* 128 S.Ct. at 596-97 (citations omitted).

Moreover, the Court is free to disagree with the Guideline ranges and policy considerations. *See Kimbrough v. United States*, 128 S.Ct. at 558. "It has been uniform and consistent in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* at 598 (citing *Koon v. United States*, 518 U.S. 81, 113 (1996)). After *Gall* it is clear that federal district courts possess great discretion on a case-by-case basis in handing down a sentence.

In this case, Mr. Rodriguez is asking this Court to not take a rigid and deferential approach to the advisory guideline range, but rather to depart downward to a more appropriate sentence of one year and one day or effectively, credit for time served. While this sentence is below the numbers-driven guidelines, Mr. Rodriguez hopes that the Court realizes that it is not only appropriate, but due to the collateral consequences and his minimal involvement, already excessively punitive. *See United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) (no abuse of discretion in district court departing from a guideline range of 41-51 months to a sentence of probation and community service; court considered collateral consequences and defendant's repentance).

**B.  The Ninth Circuit Has Declined to Apply a Presumption of Reasonableness to a Guidelines Sentence**

In *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) (en banc), the Ninth Circuit indicated that "the district court may not presume that the Guideline range is reasonable… nor should the Guidelines factor be given more or less weight than any other." *Id.* at 991 (citations omitted). "While the Guidelines are to be respectfully considered, they are one factor among the § 3553(a) factors … to be taken into account in arriving at an appropriate sentence." *Id.*, citing *Kimbrough*, 129 S.Ct. at 570; *Gall*, 128 S.Ct. at 594. An appellate court will only review the substantive reasonableness of the district court's decision by considering the "totality of the circumstances," giving "due deference to the district court's decision that the § 3553(a) factors, on

a whole, justify the … variance." *Id.* While this Court must consider the applicable range, this range is *not* presumptively the correct sentence. Instead, the Court must consider Mr. Rodriguez as an individual entitled to the consideration of the § 3553(a) factors and the Court will be granted "due deference" should appellate review ensue.

Moreover, the Court can consider specific characteristics of individual defendants, which they were previously prohibited or discouraged from considering. *See Rita v. United States*, 551 U.S. 338, 364-365 (2007) (Stevens, J., concurring) ("Matters such as age, education, mental, or emotional condition, medical condition, employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the guidelines . . . These are, however, matters that section 3553(a) authorizes a sentencing judge to consider"); *United States v. Lazenby* 439 F.3d 928, 933 (8th Cir. 2006) ("the other factors cited by the district court, though discouraged or prohibited departure factors under the mandatory guidelines, may be considered in applying the section 3553(a) factors under *Booker*").

In this case, the following factors, among others described below, warrant a variance from the advisory guidelines:

- Prison has greater significance for those imprisoned for the first time. *United States v. Paul*, 239 F. Appx 353 (9th Cir. 2007).

- Defendant's otherwise outstanding character. *United States v. Wachowiak*, 496 F.3d 744 (7th Cir. 2007).  *See* Jayne Decl., Exh. A.

- Aberrant behavior by the defendant. *See* Section 5K2.20 of the Guidelines and *United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008).

- Defendant's good deeds and past integrity. *United States v. Woods*, 159 F.3d 1132 (8th Cir. 1998).

- Defendant's personal characteristics and the offense were atypical. *United States v. Autrey*, 555 F.3d 864 (9th Cir. 2009).

- Defendant already punished by collateral consequences such as: public stigmatization, loss of any future opportunities in the United States due to being a felon, loss of financial stability, loss of employment opportunities and certain licenses for U.S. trucking companies, and inability to support his children and pregnant fiancé during his current period of incarceration.

Given this overall objective, Mr. Rodriguez asks this Court to find that the correct sentence is one that will adequately punish him, but will not contradict the recognized purposes of

LAW OFFICES
JAYNE LAW GROUP, P. C.
483 9TH STREET, SUITE 200
OAKLAND, CALIFORNIA 94607

sentencing and leave him worse off. Applying the advisory guidelines, the calculation of Mr. Rodriguez's sentence according to the United States Sentence Guidelines (U.S.S.G.) is: 37-46 months (Level 21), but the appropriate and measured sentence should not exceed one year of incarceration.

## IV. FACTORS RELEVANT TO A SENTENCE THAT IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY

The Court's duty is to impose a sentence "sufficient but not greater than necessary" to achieve the four purposes of sentencing listed in 18 U.S.C. § 3553(a)(2). *See Carty,* 520 F.3d at 991. These four purposes are: retribution; general deterrence; specific deterrence; and rehabilitation. 18 U.S.C. § 3553(a)(2)(A)-(D). In "determining the particular sentence to be imposed" the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(1)-(7).

### A. The Nature and Circumstances of the Offense and Mr. Rodriguez's History and Characteristics Show that this was Aberrant Conduct

Before this offense, Mr. Rodriguez was never arrested, imprisoned, or convicted of any crime. Further, his role in the present offense was minimal at best – he continued to drive after finding drugs in the truck. At 23 years old, his sole criminal conviction is this one. In this case, he did not willingly become involved in the offense conduct, nor did he benefit. Further, his inducement was a result of a close relationship with his stepfather, a dynamic that will never be repeated.

This Court should grant a variance based on the aberrant nature of his conduct. *See, e.g.*, *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (defendant was a "law abiding citizen, who [did] an incredibly dumb thing"); *United States v. Davis*, 2008 WL 2329290 (S.D.N.Y. June 5, 2008) (defendant was a first offender who had worked throughout his 15-year marriage to educate his six children and whose offense was prompted by economic pressures). Mr. Rodriguez's participation was a marked deviation from a solid employment history and an effort to lead a law-abiding life. His criminal history category is Level I.

LAW OFFICES
JAYNE LAW GROUP, P.C.
483 9ᵀᴴ STREET, SUITE 200
OAKLAND, CALIFORNIA 94607

**B. Need for Just Punishment in Light of Seriousness of the Offense**

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to … the nature and seriousness of harm caused or threatened by the crime; and the offender's degree of culpability …, in particular, his degree of intent (*mens rea*), motives, (and) roles in the offense...." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005).

Mr. Rodriguez has sat in jail since April 26, 2018. And these past 323 days have been incredibly traumatic for him. Life in custody is not something he ever expected to have to become accustomed to. Further, Carlos has never been inside a courtroom prior this case and thus, the entire experience has left him shocked, depressed and clearly feeling betrayed by his stepfather. In addition to the exposure of a lengthy prison term, Mr. Rodriguez faces a myriad of collateral consequences which have and will leave him and his family vulnerable and unstable for years to come. These include loss of job opportunities, loss of reputation in his community and within his family, and the recognition that his mistakes have traumatized his family. Given the manifold punishments that have already begun, and will continue in waves into the future, ample retribution can be imparted without the draconian Guidelines sentence urged by probation and the government.

**C.  Incarceration Does Little to Further General Deterrence**

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). Thus, a custodial sentence has no statistical or evidentiary value as having a deterrent effect. Accordingly, research refutes the theory that more severe sentences serve as a general deterrent (*See* U.S. Sent'g Comm'n,

LAW OFFICES
JAYNE LAW GROUP, P. C.
483 9TH STREET, SUITE 200
OAKLAND, CALIFORNIA 94607

*Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf* at 30.) In Mr. Rodriguez's case, a longer custodial sentence will not have a deterrent effect. The circumstances of this case are *unique*: he agreed to perform a legitimate service and discovered that he was used to transport the narcotics after starting the trip. It is not a circumstance this Court sees every day. Most "couriers" are being paid to transport contraband and are aware of the purpose of the journey. They are often charged with conspiracy as a result. Moreover, there is much publicity throughout the country of the prospect of mandatory minimum and heavy sentences for involvement in drug distribution. Mr. Rodriguez should not be the poster child for a longer prison term in a drug case so as to send a message of general deterrence.

Further, first-time offenders are less likely to re-offend while also being more impacted by periods of imprisonment. Before this, Mr. Rodriguez has never been arrested, incarcerated, or convicted of a crime. Therefore, the past year spent in a foreign jail, cut off from his family and friends and unable to work, has made an undeniable mark on his psyche.

### D. Incarceration Does Not Further Specific Deterrence - Need to Protect the Public

Mr. Rodriguez is not a physical danger to the public. After this ordeal and spending nearly a year in jail, he does not (nor did he ever) pose a threat of future criminal behavior. The probation officer reports that he believes Mr. Rodriguez is not likely to reoffend. Moreover, the consequences of longer incarceration are severe. As the Supreme Court freely acknowledged: "[p]risons are dangerous places." *Johnson v. California*, 543 U.S. 499, 515 (2005). The fact that the federal facilities are overcrowded makes them that much more dangerous. By the end of Fiscal Year 2013 the BOP prison population "climbed to almost 220,000, its highest level ever with

LAW OFFICES
JAYNE LAW GROUP, P.C.
483 9TH STREET, SUITE 200
OAKLAND, CALIFORNIA 94607

1  system-wide crowding at 36%." *See* U.S. Dep't of Justice, *Federal Prison System FY 2018*

2  *Performance Budget*, https://www.justice.gov/file/968981/download at 2. As a result of this

3  crowding, 100% of inmates at minimum and low security institutions were double bunked. *Id.*

4        Incarceration also causes psychic harms and has multiple "criminogenic" effects.[3] "The

5  adaptation to imprisonment is almost always difficult and, at times, creates habits of thinking and

6  acting that can be dysfunctional in periods of post-prison adjustment . . . [F]ew people are

7  completely unchanged or unscathed by the experience."[4] The psychological consequences of

8  imprisonment "may represent significant impediments to post-prison adjustment. They may

9  interfere with the transition from prison to home, [and] impede an ex-convict's successful

10  reintegration into a social network and employment setting" *Id.* Thus, rather than extending Mr.

11  Rodriguez's sentence and further traumatizing him and his family, an appropriate sentence for

12  someone with his culpability is credit-for-time-served. Upon release, he will be able to return to

13  his home in Mexico to work and provide for his family.

14    **E.  Policy Statements in Favor of Departures**

15        Pursuant to Section 3553(a)(5), the Court must consider any "pertinent policy statement"

16  issued by the Sentencing Commission. The following policy statements warrant a departure from

17  the guidelines level:

---

20  [3] *See*, *generally*, Martin H. Pritikin, *Is Prison Increasing Crime*, 2008 Wis L. Rev. 1049, 1054-72

21  (cataloging eighteen criminogenic effects of incarceration); *see also* U.S.S.C., Staff Discussion Paper,
    *Sentencing Options under the Guidelines* 19 (1996) (recognizing imprisonment has criminogenic effects

22  including: contact with more serious offenders, disruption of legal employment, and weakening of family
    ties).

23  [4] Craig Haney, *The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment* 4
    (2001), http://aspe.hhs.gov/hsp/prison2home02/haney.pdf.

LAW OFFICES
JAYNE LAW GROUP, P.C.
483 9ᵀᴴ STREET, SUITE 200
OAKLAND, CALIFORNIA 94607

(1) <u>U.S.S.G. 5H1.6 – Family Ties and Responsibilities.</u>

While family ties and responsibilities are not *ordinarily* relevant in the average case, per the Commission, per Application Note 1(B), the Court may consider a departure based on loss of caretaking or financial support. In fact, despite this limitation, U.S.S.G. § 5H1.6 is the third most common reason given by courts to justify a departure from the guideline range. *See* Table 25 of the U.S.S.C. Interactive Sourcebook of Federal Sentencing Statistics at

https://isb.ussc.gov/api/repos/:USSC:table_xx.xcdf/generatedContent?table_num=Table25.  In this case, a sentence within the guideline range – or any longer custodial sentence – will "cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family." *Id*.

The Court can consider whether the loss of financial support exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. § 5H1.6 App. Note 1(B)(ii) (iii). Mr. Rodriguez's family obligations are one of those unique harms not ordinary to an incarcerated defendant because he was the sole breadwinner for his family *in a country already plagued by poverty*. He specifically set out to ensure his family would not live in poverty by getting his commercial license and successfully landing several jobs with reputable trucking companies. This accomplishment in Mexico, given the lack of opportunities there, merits recognition. Thus, in his continued absence, his family faces more risk and impoverishment. His physical presence and ability to contribute to his children and wife is irreplaceable.

(2) <u>U.S.S.G. 5K2.0 – Other Grounds for Departure</u>

Mr. Rodriguez respectfully contends that several factors support a departure from the Sentencing Guidelines per U.S.S.G. § 5K2.0. The factors noted in point (1) above takes this case out of the heartland. While Mr. Rodriguez's conduct was wrong, he did not plan or coordinate the offense.

**CONCLUSION**

The Probation Department and the Government would be hard-pressed to argue that a one-year custodial sentence would fail to *correct* Mr. Rodriguez's behavior. He has never been to jail

LAW OFFICES

JAYNE LAW GROUP, P.C.

483 9™ STREET, SUITE 200
OAKLAND, CALIFORNIA 94607

or prison previously, has no prior convictions, has a supportive family and community, employment skills, and a strong desire to work hard and make the most of his life in spite of the conviction. The sentence proposed herein – not insignificant for someone like Mr. Rodriguez – *is* a pragmatic sentence that will serve the interests of deterrence, retribution and rehabilitation. Moreover, the end result is that Mr. Rodriguez will forever face the consequences of this conviction.

Any lengthier custodial term recommended by the Government would conflict with the goals articulated in the sentencing statute designed to ensure than an offender successfully rehabilitates and re-joins society as a fully functional and law-abiding citizen. Mr. Rodriguez has attempted to articulate to this Court his remorse, sorrow, and responsibility for the offense. Going forward, he will never blindly trust others, and in the event that he discovers criminal conduct, he will remove himself from the situation immediately.

As such, the defense respectfully requests that the court sentence Mr. Rodriguez to a custodial term of one year and one day or a term of credit for time served and all other standards terms and conditions.

Respectfully Submitted,


DATED:  March 8, 2019

/jmj/
Julia Mezhinsky Jayne
Counsel for Carlos Luna Rodriguez

Case No. CR 18-00240 CRB
DEFENDANT'S SENTENCING MEMO

LAW OFFICES
JAYNE LAW GROUP, P.C.
483 9TH STREET, SUITE 200
OAKLAND, CALIFORNIA 94607